IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TERRY L. VAUGHN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | Civil No. **04-290-CJP**[1] |
| ) | |
| **JO ANNE B. BARNHART**[2], ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

# ORDER

**PROUD, Magistrate Judge:**

By written opinion dated June 19, 2003, Administrative Law Judge Peter M. Davenport concluded that plaintiff Terry L. Vaughn was not disabled, and that, despite multiple "severe" impairments, he was capable of performing a range of "medium" work, including his past work. The Appeals Council of the Social Security Administration denied plaintiff's request for review, making ALJ Davenport's decision the final decision of the Agency. Pursuant to 42 U.S.C. § 405(g), plaintiff now seeks review of the administrative decision denying him a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i), Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382.  **(Doc. 1).**  The administrative record and the parties' briefs are before the Court.  **(Docs. 8, 12 and 16).**

---

[1] Pursuant to 28 U.S.C. § 636(c)(1), upon the consent of the parties **(Docs. 5 and 9)**, Chief U.S. District Judge G. Patrick Murphy referred this case to the undersigned Magistrate Judge for any and all proceedings and entry of judgment **(Doc. 10)**.

[2] Plaintiff's complaint does not refer to the Commissioner of Social Security by name; this Court takes judicial notice that Jo Anne B. Barnhart became Commissioner of the Social Security Administration November 9, 2001.

1

## Issues Presented

Plaintiff Vaughn argues:

1. The ALJ erred in evaluating plaintiff's complaints of pain by:

    a. Finding plaintiff's testimony not credible;

    b. Stating plaintiff is "prescribed anti-inflammatory medications, but no strong narcotic pain relievers," when plaintiff was prescribed Lortab, an opiod analgesic; and

    c. Discounting the functional capacity report from plaintiff's treating physician, Dr. Coleman;

2. The ALJ erred in evaluating plaintiff's sleep apnea by stating, "Dr. Meriweather stated [plaintiff's] sleep apnea was corrected with CPAP therapy," because:

    a. There are no records from "Dr. Meriweather;"

    b. Plaintiff had switched to a BiPAP machine, but was still dozing off during the day; and

    c. Citing a 2002 sleep study report indicating that plaintiff's sleep apnea was "correctable with CPAP treatment," ignoring plaintiff's testimony that he still dozed during the day despite using the BiPAP machine, and then asserting that plaintiff's sleep apnea was "corrected;"and

3. The ALJ improperly discounted plaintiff's testimony and objective medical evidence of low back and hip pain at L5-S1 and L4-L5 (evidence made available to the Appeals Council).

**(Doc. 12).**

The defendant Commissioner generally counters that sufficient evidence in the record supports the ALJ's decision, and typographical errors and minor discrepancies are insufficient to warrant remand. Defendant also observes that the evidence establishes that plaintiff's sleep apnea was corrected with a CPAP machine and an absence of evidence that switching to a

2

BiPAP machine altered that condition. Defendant further opines: Dr. Coleman's conclusions were properly discounted due to inconsistencies; evidence never presented to the ALJ cannot form a basis for finding that a decision was not supported by sufficient evidence; and, plaintiff has failed to request a sentence six remand, thereby waiving the issue. **(Doc. 16).**

## Applicable Legal Standards

To qualify for DIB or SSI[3], a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5)

---

[3]The statutes and regulations pertaining to DIB are found at **42 U.S.C. § 1382, et seq.**, and **20 C.F.R. pt. 404**. The statutes and regulations pertaining to SSI are found at **42 U.S.C. §§ 1382 and 1382c, et seq.**, and **20 C.F.R. pt. 416**. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, **20 C.F.R. § 416.925** detailing medical considerations relevant to an SSI claim, relies on **20 C.F.R. pt. 404 subpt. P**, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations/Section 404 out of convenience.

whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  ***See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 416.920(b-f) and 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether plaintiff was, in fact, disabled, but whether ALJ Davenport's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  ***See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).**  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled.  ***Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984).**  If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three).  If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job.

*Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).

### Synopsis of Relevant Evidence Regarding Plaintiff's Condition

Plaintiff Terry L. Vaughn applied for SSI, DIB and a Period of Disability, alleging the onset of disability as of February 2, 2002.  **(Doc. 8 ("R."), pp. 325-329).**  Plaintiff claims disability due to chronic fatigue syndrome, multiple joint pain, sleep apnea, low back pain, fibromyalgia and carpal tunnel syndrome.  **(Doc. 12, p. 3;** *see also* **R. 353-359).**

A review of the medical records supplied by Dr. Yap, plaintiff's treating physician from December 1981 to March 2000, reveals a very lengthy history of treatment for a variety of ailments.  **(R. 143-217).**  Of particular relevance is a low back injury sustained at work in September 1981, diagnosed as a low back strain; and a November 1999 diagnosis of depressive disorder and fibromyalgia.  **(R. 145 and 214).**  An October 1999 x-ray of plaintiff's c-spine was normal.  **(R. 218).**  Dr. Yap's final evaluation in March 2000 diagnosed plaintiff as having fibromyalgia, a herniated lumbar disc, osteoarthritis, hypertension, degenerative disc disease, tension headache, rest disorder, chronic sinusitis and depressive disorder– although a physical examination was characterized as "negative."**(R. 142 and 143).**  Dr. Yap observed plaintiff had a slight limitation of the lumbar spine, he squatted with difficulty, and was unable to walk on his heels and toes.  **(R. 143).**  Plaintiff worked for Dr. Yap for 19 years, part-time as a gopher/handyman, until he was terminated in February 2002 in relation to his declining health.  **(R. 64, 221 and 353).**

An April 2000 consultative medical exam by Dr. Bhupendra Patel, M.D., based on a record review and exam, diagnosed plaintiff as having fibromyalgia, low back pain with decreased range of motion of the lumbar spine (not c-spine), neck pain, headache, fatigue and

high blood pressure (unmedicated).  **(R. 225-226).**  Dr. Patel opined that, although plaintiff stated he had not brought the cane he usually used, no assistive device was needed.  **(R. 223 and 225).**  Plaintiff's extremities were all rated 5/5 for strength, and were deemed normal; his knees, hips and c-spine were deemed normal, but his lumbar flexion and extension was only to 45° and 15° laterally in both directions.  **(R. 225).**  According to plaintiff, at that time he was only capable of standing 15 minutes, sitting 30 minutes and walking a half block.  **(R. 224).**  However, a residual functional capacity assessment by Dr. E.C. Bone, M.D., indicated plaintiff was capable of:  lifting and carrying 20 pounds occasionally and 10 pounds frequently, with a corresponding ability to push and pull with all extremities; standing, walking and sitting for six hours out of an eight hour work day; postural limitations were noted; no manipulative limitations were found.  **(R. 241).**  Accordingly, Dr. Bone considered plaintiff capable of light work.

An April 2000 psychological evaluation by Dr. Harry J. Deppe, Ph.D., based on a record review and exam noted that plaintiff had been prescribed Prozac in connection with his tension, which was considered tied to his back pain.  **(R. 221).**  Dr. Deppe deferred diagnosis, but observed that plaintiff denied significant symptoms of depression and anxiety, and he continued to work for Dr. Yap part time.  **(R. 221).**  A May 2000 psychiatric review by Dr. Carl Hermsmeyer, Ph.D., indicated plaintiff suffered from an affective disorder with disturbance of mood accompanied by a full or partial manic or depressive syndrome, as evidenced by difficulty concentrating or thinking.[4]  **(R. 227-230).**  Plaintiff was considered to have: slight restriction of the activities of daily living; no limitations in social functioning; seldom experiencing

---

[4]A depressive syndrome must be substantiated by four findings **(20 C.F.R. 404, Subpt P., App. 1, § 12.04(A)(1))**; only one was noted **(R. 230)**.

deficiencies in concentration, persistence and pace; and never experiencing episodes of deterioration or decompensation. **(R. 234).**

Plaintiff began a treating relationship with Dr. Andrew J. Coleman, M.D., in January 2002. **(R. 291-292).** At that time plaintiff explained that he thought his depression, for which he was taking Prozac, and his arthritis, for which he was taking Arthrotec, were both undertreated. **(R. 291).** Plaintiff described experiencing chronic pain and sadness, and he reported that he could not walk more than a block or two. **(R. 291).** Upon examination, Dr. Coleman found a tender lumbar area, diminished range of motion diffusely, tendinitis in both elbows, a normal neurological exam, and no depressed affect. **(R. 291).** Plaintiff's Prozac was increased, and he was continued on Arthrotec. **(R. 292).** Two weeks later plaintiff described not sleeping well due to pain and spasms. **(R. 285).** No prominent weakness or sensorial abnormalities were found, and a normal gait was observed. **(R. 285).** Plaintiff was diagnosed with joint pain at multiple sites, osteoarthritis and depressive disorder. **(R. 286).**

In April 2002, Dr. Coleman noted that plaintiff had slightly limited range of motion, but his strength and sensation were intact. **(R. 279-280).** Plaintiff was continued on Zoloft and Naprosyn. **(R. 280).** In May 2002, diffuse tenderness in almost every major muscle group was noted, although in June 2002 plaintiff still had a normal gait. **(R. 273 and 276).** Plaintiff was diagnosed with insomnia with sleep apnea, depressive disorder, osteoarthritis, and malaise and fatigue. **(R. 273).** Ambien was added to plaintiff's medications to treat his sleep problems. **(R. 274).** Plaintiff indicated in July 2002 he could sit for 45 minutes to an hour; he rests 30 to 60 minutes, but only if his fatigue is bad; he does yard work once a week for about 20 minutes; he still drives and leaves home three or four times per week. **(R. 108-112).**

In September 2002, Dr. Raymond Leung, M.D., diagnosed plaintiff with: fibromyalgia, with pain, fatigue and decreased sleep; lumbar disc disease, with a full range of motion in the lumbar spine, but a mild limp; and knee pain, although past x-rays were negative and plaintiff still had a full range of motion. **(R. 245).** Dr. Leung recorded that plaintiff complained of constant low back and knee pain, but he had not had surgery, nor did he use a cane or other assistive device. **(R. 242-243).** Plaintiff was taking Naproxen and Naprosyn, which plaintiff did not find very helpful. **(R. 242-243).** According to Dr. Leung: plaintiff could heel and toe walk; squat; he had forward flexion to 90º without tenderness; he had a mild limp; he had no difficulty getting on and off the exam table; his grip strength and fine finger movement were good; he was mildly tender diffusely without any significant differences between trigger and non-trigger points; and neurologically, plaintiff was normal. **(R. 244).** An October 2002 residual functional capacity assessment by Drs. B. Rock Oh and Clement A. Gotway, based on a record review, indicated plaintiff was capable of : lifting and carrying 50 pounds occasionally and 25 pounds frequently; unlimited pushing and pulling with all extremities; standing, sitting and walking for six hours out of an eight hour work day; and no manipulative limitations wee noted, but there were postural limitations. **(R. 255-262).** Plaintiff's activities had changed little from July to November, 2002– he reported being able to walk about 30 minutes, he continued to mow his yard twice per month, but he reported now napping on a daily basis. **(R. 128-131).**

Sleep tests in August and September 2002 confirmed that plaintiff has obstructive sleep apnea, "corrected" with a CPAP unit, and sleep induced periodic leg movements/restless leg syndrome. **(R. 250).**

In April 2003, the month before the hearing before ALJ Davenport, Dr. Coleman

diagnosed plaintiff with osteoarthritis, joint pain, sleep apnea, brachial neuritis, asthma, hypercholesterolemia, anxiety, depression, myalgia and carpal tunnel syndrome (onset February 2003).  **(R. 320).**  Plaintiff was described as being in extreme pain all the time, all over.  **(R. 323).**  He was prescribed Celebrex, Lexapro, Allegra, Neuronin, Lortab, Halcion, Librium and wrist splints.  **(R. 309-310).**  Plaintiff confirmed that he sees only Dr. Coleman, and he opined that Dr. Coleman had not suggested surgery with him because Dr. Coleman knows plaintiff cannot afford it– although plaintiff later testified he is covered under his wife's insurance.  **(R. 359 and 369).**

Dr. Coleman opined that all of plaintiff's ailments were expected to last for at least a year.  **(R. 320).**  Dr. Coleman also reported that plaintiff could only work an hour or two, maybe less.  **(R. 321).**  Plaintiff was not deemed able to stand or walk for any appreciable time; he could sit for one hour; he had to recline for 30 minutes every two hours; he could lift less than ten pounds; he could not carry; he could not reach above shoulder level; he could not push or pull, nor could he grasp or perform fine manipulation; and he was unable to use foot controls.  **(R. 321-323).**  According to Dr. Coleman, plaintiff should not drive, use machinery, be at heights, and he required environmental restrictions relative to avoiding extreme temperature changes, fumes, dust and the like.  **(R. 322).**

Relative to plaintiff's sleep apnea, in April 2003 he returned to the sleep disorder center due to trouble sleeping with the CPAP machine; he was switched to a BiPap unit and prescribed Trazadone.  **(R. 317).**

In May 2003, plaintiff testified at a hearing before ALJ Davenport.  **(R. 348-372).**  At that time plaintiff was 47 years old, with a high school education.  **(R. 351-352).**  Plaintiff

reported that he hurt all over, particularly his shoulders, knees, low back and hips. **(R. 354 and 356).** According to plaintiff, his pain is typically six to eight on a ten scale, but five or six days per month his back and hip pain rises to eight or nine, making walking a problem, although sitting is not a problem. **(R. 356-357).** Plaintiff also estimated that he was completely laid-up five to ten days per month**. (R. 357).** With respect to his wrists, plaintiff stated that Dr. Coleman had not performed any tests, the diagnosis of carpal tunnel syndrome was based on Dr. Coleman feeling plaintiff's wrists. **(R. 358-359).** Plaintiff described his wrist pain as being constant and six to seven on a ten scale in severity. **(R. 358-359).** Plaintiff was wearing wrist guards at the hearing. **(R. 358).**

By plaintiff's estimation, he could stand 15 to 20 minutes before his leg pain became too bad; he could sit for 20 minutes in a chair (other than a recliner); squatting was difficult; he cannot bend over; he can only walk a half block; stairs are difficult; he has trouble pushing and pulling; and he can only lift a pound or two– he dropped a gallon of milk. **(R. 359-363).**

Plaintiff described fatiguing easily and napping three or four times per day, for anywhere from 15 minutes to three hours at a time. **(R. 355).** Plaintiff reported having trouble sleeping– despite the BiPAP unit– due to aching. **(R. 355 and 358).** He also described dozing off about six times per day for 15 minutes to three hours. **(R. 358).** According to plaintiff, he even dozed off while waiting for the hearing to begin. **(R. 358).**

Plaintiff testified that he still drives a little, using the clutch hurts his leg. **(R. 363).** The longest trip plaintiff took in the past year was the 45 minute drive to his attorney's office. **(R. 363).** Occasionally, plaintiff still bank fishes with his son for 30 minutes to an hour, and he reported

still mowing his own yard with a motorized push-mower, although he indicated it took him about thirty minutes, twice as long as usual. **(R. 366-367).** On a typical day, plaintiff gets up and dresses, eats, lays on the couch for 40 minutes, fiddles around the house, walks around the house a couple of times to stay limber, sits down, walks around the house a few more times, naps from around 2:00-3:00, and spends his evening watching television, and he goes to bed around 10:00. **(R. 367-368).**

An October 2003 MRI of plaintiff's lumbar spine was submitted to the Appeals Council. **(R. 347).** The MRI showed a suggestion of an annular tear at L5-S1, where there is mild disc herniation but no significant disc space height loss; and a mild broad base disc bulge at L4-L5, causing mild canal stenosis. **(R. 347).** The MRI indicated a normal spinal cord signal relative to the injury at L5-S1; and relative to the L4-L5 injury, the nerve roots exited without difficulty. **(R. 347).** The Appeals Council elected to only rely on the claim file and he ALJ's decision, not the October 2003 MRI. **(R. 6-7).**

## **Vocational Evidence**

At the May 2003 hearing vocational expert John Grenfell testified regarding the exertional requirements of plaintiff's past work. Based on the Dictionary of Occupational Titles (DOT) and the documented descriptions provided by plaintiff about his various jobs, plaintiff's jobs as a mall security guard; performing mall clean-up and as an over-the road trucker were characterized as either light or medium work. **(R. 369-370).** Plaintiff's last job, as a handyman for Dr. Yap, was characterized as heavy in the DOT, but Grenfell noted plaintiff described lifting about ten pounds in that job. **(R. 370).**

Grenfell opined that if all of plaintiff's testimony were taken as true, no work would be

available. **(R. 370).** Based on Dr. Coleman's final residual functional capacity assessment, allowing for only one hour of activity during an eight hour work day, no work would be possible. **(R. 370-371).** However, all of plaintiff's past medium and light work would be able to be performed, if plaintiff could perform a range of medium work requiring: lifting 50 pounds occasionally and 25 pounds frequently, with corresponding pushing and pulling; and standing, walking and sitting for six hours out of an eight hour day, with certain postural limitations. **(R. 371).** Plaintiff would also be able to perform his job as a handyman, if performed the way plaintiff described it, as opposed to how such a job is described by the DOT. **(R. 371).** Grenfell did not consider moderate depression– requiring entry level, low stress work– to be an impediment to plaintiff performing his past work. **(R. 370-371).**

### ALJ Davenport's Decision

ALJ Davenport found that plaintiff had generalized osteoarthritis; sleep apnea, treatable with CPAP therapy; generalized fatigue and myalgia, probably related to sleep apnea; and depressive disorder– all deemed severe, but not meeting or equaling any of the presumptively disabling impairments for purposes of 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. **(R. 18 and 22).**

The ALJ concluded that plaintiff's depression was treated with medication, with good results. **(R. 18).** He also noted that plaintiff had worked for years with depression, and that no additional treatment had been sought or recommended. **(R. 18).** The ALJ found a moderate degree of limitation based on Dr. Deppe and Dr. Hermsmeyer's opinions, as well as plaintiff's statements that Prozac helped him. **(R. 18).** Accordingly, ALJ Davenport evaluated plaintiff's depressive order under Medical Listing 12.04, concluding plaintiff had mild difficulties

maintaining social functioning, mild to moderate difficulties with concentration, persistence and pace, no episodes of decompensation, and no C criteria, thereby limiting plaintiff to entry-level, low-stress jobs. **(R. 19).**

Relative to plaintiff's lumbar spine, ALJ Davenport observed that Dr. Yap's exam had not turned up anything significant, there was no objective evidence of a herniation and plaintiff had only received conservative treatment until 2000, which is consistent with the 1995 MRI that showed only a minimal bulge. **(R. 19).** The ALJ considered Dr. Coleman's treatment to be consistent with Dr. Yap's, consisting mainly of "anti-inflammatory medications." **(R. 19).** Although Dr. Coleman's last evaluation described a severely restricted person, the ALJ found Dr. Coleman's evaluation unreasonable and unsupported by the medical evidence. **(R. 20-21)**.

The ALJ cited "J. Metcalf, M.D.," as diagnosing plaintiff with sleep apnea. **(R. 19).** ALJ Davenport also cited a September 2002 study showing plaintiff's sleep apnea is "correctable with CPAP therapy." **(R. 19).** The ALJ then noted that plaintiff had not returned to "Dr. Meriwether" for treatment of his sleep apnea or restless leg syndrome. **(R. 19)**.

With respect to plaintiff's testimony, ALJ Davenport did not find plaintiff credible, because the objective medical evidence was not perceived as supportive of his testimony. **(R. 20).** The ALJ again referred to "Dr. Meriwether's" statement that plaintiff's sleep apnea was "corrected" with CPAP therapy. **(R. 20).**

ALJ Davenport found that plaintiff had the residual functional capacity for a range of medium work, in that plaintiff could: lift and carry 50 pounds occasionally and 25 pounds frequently, and push and pull within those limits; stand, walk and sit for six hours out of an eight hour day; had certain postural limitations; and was limited to entry-level, low-stress jobs **(R. 21**

**and 22-23).**  Consistent with vocational expert Grenfell's testimony, plaintiff was found to be able to perform his past work.  Therefore, the ALJ concluded plaintiff was not disabled.  **(R. 23).**

## Analysis

Plaintiff does not specifically take issue with the ALJ's conclusions relative to the first, second and third steps of the five-step sequential analysis.  Plaintiff easily satisfies the first step in the five-step analytical test; he is not currently employed, and he has not worked since February 2002.  At the second step in the analytical process, ALJ Davenport found that plaintiff had generalized osteoarthritis; sleep apnea, treatable with CPAP therapy; generalized fatigue and myalgia, probably related to sleep apnea; and depressive disorder– all deemed severe.  And, at the third step none of those ailments were found presumptively disabling in accordance with the presumptively disabling diseases listed at 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A.

At the fourth step in the sequential analysis ALJ Davenport concluded plaintiff had the residual functional capacity for a range of medium work, which would include his past work.  Plaintiff takes issue with those conclusions, as reflected in the issues raised by plaintiff, enumerated above.

Residual functional capacity is an administrative assessment of what work-related activities a claimant can perform *despite* his or her limitations.  *See* **20 C.F.R. § 404.1545(a); and *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).**  "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the record." *Id.* Residual functional capacity determinations are reserved exclusively to the Commissioner (20 C.F.R. § 404.1527(e)), so the opinion of, for example Dr. Coleman, is not

14

necessarily controlling or determinative. For reference it is important to keep in mind the definition of medium work:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

**20 C.F.R. §§ 404.1567(c) and 416.967(c).**

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. §§ 404.1567(b) and 416.967(b).**

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

**20 C.F.R. §§ 404.1567(a) and 416.967(a).**

> According to Social Security Ruling 83-10:
>
> The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer

15

activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms. The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

**S.S.R. 83-10, Glossary (1983).**

### 1.  Pain
### a.  Plaintiff's Credibility

Section 404.1529(c)(2) dictates that subjective statements about the intensity and persistence of pain, and its effects on one's ability to do work, should not be rejected solely because they are not substantiated by available medical evidence.  At the same time, an ALJ's credibility determinations are given "special deference because the ALJ is in the best position to see and hear the witness and determine credibility." ***Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).**  "Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." ***Luna v. Shalala*, 22 F.3d 687, 691(7th Cir. 1994).**

A review of the record and plaintiff's testimony at the May 2003 hearing reveals ample reason for not finding plaintiff wholly credible.  Plaintiff told Dr. Patel, the consulting doctor, that he used a cane, but there is no evidence that plaintiff was ever prescribed a cane or other

16

assistive device, nor is there any evidence he ever reported having to use a cane to Dr. Coleman or anyone else. Plaintiff reported that he napped three to four times per day for 15 minutes to three hours, and that he dozed off as a result of sleep apnea in a similar pattern, but when he was asked to describe a typical day plaintiff mentioned laying on the couch for 40 minutes in the morning and only a one hour nap in the afternoon. Plaintiff described being able to stand for only 15 to 20 minutes and walk only a half block, but he mows his yard with a push mower for about 30 minutes, twice per month, and he also continues to go bank fishing for 30 minutes to an hour. Plaintiff indicated he could sit for only 20 minutes at a time, but he subsequently testified that sitting was not a problem, and he noted that he had made the 45 minute drive to his attorney's office. Plaintiff indicated he dozed off virtually spontaneously, yet he continued to drive. Plaintiff also opined that surgery was not discussed by Dr. Coleman because the doctor knew plaintiff could not afford it, yet plaintiff acknowledged that he is covered by his wife's insurance.

    Plaintiff testified that his pain was typically six to eight on a ten scale, rising to eight or nine five of six days per week– keeping in mind that the ALJ had defined ten as "the worst pain imaginable," "[i]f you were getting burned up in a fire, you'd be screaming in mortal agony, that would be a ten." **(R. 355-356).** In light of plaintiff's ability to cut his own lawn, fish and drive, it does appear that plaintiff is prone to exaggeration, as the ALJ concluded. The fact that plaintiff was prescribed Lortab in February 2003 does not throw the ALJ's analysis and conclusions into question. Defendant concedes Lortab is a narcotic analgesic, and the Court recognizes it is prescribed for moderate to severe pain. **(Doc. 16, p. 11, n. 5).** However, plaintiff did not attribute any bad side effects to Lortab. **(R.354).** The ALJ's incomplete

17

description of the nature of the medication does not override plaintiff's admitted retained ability to mow his yard, fish and drive.  If the Lortab was insufficient, why didn't Dr. Coleman prescribe a stronger medicine?  Having concluded that plaintiff is not wholly credible, his assertions regarding his pain cannot be factored into the analysis.

Plaintiff takes issue with the ALJ discounting the evaluation of his treating physician, Dr. Coleman.  A treating physician or psychiatrist's opinion will generally be given more weight, provided it is "well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  **40 C.F.R. § 404.1527(d)(2).**  Therefore, although the opinion of plaintiff's treating psychiatrist, Dr. Coleman, must be considered, it is not necessarily controlling.  **40 C.F.R. § 1527(e);** *see also* ***Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).**  However, plaintiff's own account of his abilities in May 2003 illustrate how exaggerated Dr. Coleman's opinions are.  Dr. Coleman reported that plaintiff could only work an hour or two, maybe less.  **(R. 321).**  Plaintiff was not deemed able to stand or walk for any appreciable time; he could sit for one hour; he had to recline for 30 minutes every two hours; he could lift less than ten pounds; he could not carry; he could not reach above shoulder level; he could not push or pull, nor could he grasp or perform fine manipulation; and he was unable to use foot controls.  **(R. 321-323).**  According to Dr. Coleman, plaintiff should not drive or use machinery.  According to plaintiff, he drives, mows and fishes and, by plaintiff's own estimations, those activities exceed the limitations listed by Dr. Coleman.  With respect to plaintiff's newly diagnosed carpal tunnel syndrome, Dr. Coleman's records reveal no basis for that diagnosis, and plaintiff acknowledged that no tests were run.  Therefore, Dr. Coleman's evaluation was properly discounted by the ALJ.

Plaintiff's attempt to use the ALJ's slight misstatements regarding "Dr. Meriwether" and whether plaintiff's sleep apnea was corrected or correctable is not well taken in light of the clear evidence in the record. Regardless of the name of the doctor, sleep tests in August and September 2002 confirmed that plaintiff has obstructive sleep apnea, "corrected" with a CPAP unit, and sleep induced periodic leg movements/restless leg syndrome. **(R. 250).** Although plaintiff was switched to a BiPAP machine because he felt like the CPAP unit was smothering him, by plaintiff's own admission his difficulties sleeping are due to his aching, and there is no suggestion that the CPAP or BiPAP machines were ineffective and that his sleep apnea was not corrected with either unit. Plaintiff's testimony that he dozed off prior to the hearing does not save the day since he has been found not credible, and since he continues to feel capable of driving.

Defendant correctly notes that plaintiff has waived any argument regarding the Appeals Council's failure to take the October 2003 MRI of plaintiff's lumbar spine into account. Plaintiff has presented no argument for a sentence six remand under Section 405(g). Moreover, that evidence is irrelevant to whether there is substantial evidence to support the ALJ's decision. Section 404.976 dictates in pertinent part:

> The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it *which relates to the period on or before the date of the administrative law judge hearing decision*. If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application.

**20 C.F.R. § 404.976(b)(1) (emphasis added).** The ALJ's decision was issued in June 2003, and the MRI was not until October, 2003.

**IT IS THEREFORE ORDERED** that, for the aforestated reasons, the Agency decision denying plaintiff Terry L. Vaughn a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i), Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382, is affirmed in all respects.  Judgment shall enter accordingly.

**IT IS SO ORDERED.**

DATED: September 26, 2005

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**
